**CONSUMERS MONEY ORDER CORPORATION, Appellant,**

v.

**Leonard PETTIT et al., Respondents.**

**No. 23564.**

Kansas City Court of Appeals.

Missouri.

June 4, 1962.

Sheffrey, Ryder & Skeer, by Byron Milgram, Kansas City, for appellant.

Hammond C. Woods, Kansas City, for respondents.

HUNTER, Presiding Judge.

This appeal involves the interpretation of a trust agreement and an insurance letter to determine upon which of the parties a loss of $1,445.34 from a burglary falls.

Plaintiff-appellant, Consumers Money Order Corporation, is in the business of supplying its licensed agents with money orders to be sold to the general public. Respondents-defendants, Mr. and Mrs. Leonard Pettit, owners of a drug store in Kansas City, originally sold their own money orders but on September 29, 1960, entered into a written contract designated "trust agreement" with Consumers Money Order Corporation whereby in consideration of the Pettits being appointed by appellant as its licensed agents to sell appellant's money orders, the Pettits agreed to comply with the terms of the trust agreement.

Paragraph 4 of the trust agreement requires the Pettits to pay over to appellant's collection agent all proceeds from the sale of money orders, less a stated selling commission. Paragraph 5 provides that except as modified by separate written agreement, the Pettits are to save appellant harmless from loss or destruction of the proceeds realized from the sale of money orders from any cause whatsoever, including burglary.

As a result of some discussion on the subject, on October 21, 1960, Consumers Money Order Corporation issued to the Pettits an "insurance letter" in which it undertook and agreed "that insurance in the amount of $1,500.00" covering among other incidents "safe burglary" was to be provided the Pettits by the Corporation. Another provision of the insurance document stated, "Please note that there is no coverage whatsoever on * * * (2) the loss of funds, by any cause whatsoever, which you have failed to promptly turn over to our collector after he has called upon you to collect the said funds. * * *"

At the time the trust agreement was signed the Pettits and appellant's regional manager, Mr. Burroughs, discussed the collection practice to be followed. Mr. Burroughs testified, "Mr. Pettit suggested and I readily agreed that we should make collections twice a week in order to reduce the number of checks and cash on hand in the store." Collections were to be made regularly on each Monday and Thursday. Each Monday was to be "the regular settlement day" whereas each Thursday was to be "purely collection of cash".

Mr. Burroughs was the one who on behalf of his company made all the collections from the first to and including the last one before the burglary. He explained the difference in the Monday and Thursday collections. Each Thursday "I would go into the store, get out the books that I needed, the record forms, and Leonard would hand me a box containing cash. I would pay no attention to the records of the money orders but would simply count the cash and the checks and give him a receipt for that cash. I didn't make up the regular report; I didn't attempt to audit anything at all; I would simply count the checks and the cash." However, on each Monday "(I) would not only count the cash and checks on hand then but (I) would make a complete report of the money orders sold during the past week, and part of the proceeds that he gave me would of course be accounted for by the receipt which I had given him on the prior Thursday. * * * Monday was the day we brought everything up to date."

Mr. Burroughs knew and understood that with regard to the Monday collections it was the practice of the Pettits because of the practical problem of operating a busy store not to have their records added up to the very moment of Mr. Burroughs' arrival but rather as Mr. Burroughs stated it, to omit "Those that they may have sold during those few hours, or on that particular day of the collection. Q. Am I to infer, then, that there wasn't a complete

accounting for every penny that wasn't on hand and every money order that was in their possession? A. Not right to the penny. It was almost an impossibility unless I wanted to spend a great deal of time in the store to bring everything up to the last money order sold. They would do this prior to my arrival. * * * In the regular course of things as I understood it Mrs. Pettit would add them up in the morning. * * * The records were ready when I got there in the evening. Q. And they turned over everything they had the records on? A. Yes. Q. Didn't you know at that time that there would be funds on hand that weren't included in those records? A. We would assume that there were some that they had written that day (after the report was made up)." Normally, this was not a large sum. "Q. Had Mr. or Mrs. Pettit or Mr. Dykes ever refused to turn over money to you that you asked them for? A. No, they never have."

Mr. Pettit's testimony was that appellant's agent never asked for and never expected to receive on the Monday collections any money from business transacted on the collection day but only that included on the report made up "prior to the day he was there." Other evidence indicated that Mr. Burroughs had no set time for his arrival at the store for the Monday collections, and, hence, that it was the recognized practice for the Pettits to have their collection records made up before and ready when the store opened for business on each Monday.

On the day in question, Monday, January 23, 1961, Mr. Burroughs arrived at the store about 5:00 or 5:30 p. m. The store was crowded. He stayed until after 6:00 p. m. He made the usual collection. "Q. Was there anything different (about this collection)? A. To the best of my knowledge everything was just as it should be there." Thereafter, during the night of January 23rd, the store was burglarized, the safe broken into, and $1,574.54, constituting proceeds from the sale of money orders, was taken by the burglars. Later,

$129.20 was recovered leaving a loss balance of $1,445.34.

It is the contention of Consumers Money Order Corporation that the loss of this stolen money is not within the mentioned insurance coverage because the Pettits had it in their possession at 5:30 p. m. on January 23, 1961, and had failed to turn it over to its collector, Mr. Burroughs. The Pettits contend the loss is within the terms of the insurance document, noting that both the language of the document and the interpretation placed upon it by the parties by their actions contemplated that such money would not be collected at that time and, hence, would be insured against loss by burglary. The case was tried to the court as jury waived. The trial court found the issues for the Pettits, rendered judgment accordingly, and this appeal followed.

■■ The rule is firmly established in Missouri that insurance contracts, like other contracts, are accorded reasonable interpretations. The court discharges its full duty when it ascertains and gives effect to the intention of the parties, as disclosed by the contract they have made. The guiding principle is to view the contract in a reasonable, practical and sensible manner so as to accomplish the purpose for which it was made and intended rather than to view it in a strict, overly technical manner which would defeat its purpose or object. The application of the terms of an insurance policy to any given situation should likewise be determined by the same rules of common sense so as to carry out the intent of the parties thereto. 44 C.J.S. Insurance § 296, page 1163; McKinney v. Truck Insurance Exchange, Mo.App., 324 S.W.2d 773 (3–6).

■ It is tacitly conceded that the loss of funds in question is covered by the insurance document unless the exception noted above applies, namely, "(2) the loss of funds, * * * which you have failed to *promptly* turn over to our collector after he has called upon you *to collect the said funds*

\* \* \*." (Emphasis ours.) As we view it, the determinative question is, did the insurer's collector, Mr. Burroughs, call on the insured, the Pettits, to collect "said funds"—that is, funds resulting from transactions occurring on the day of the collection; and, if so, did the Pettits fail to turn them over "promptly".

The testimony gives a clear answer to these questions. Mr. Burroughs did not call on the Pettits to *collect* funds obtained by them from the Monday collection day transactions. As a matter of convenience to him, on Mondays he called to collect only those funds obtained prior to Monday and upon which funds the Pettits customarily had previously prepared the contemplated records. Mr. Burroughs could have collected all of the money the Pettits had (as he did each Thursday) and later have obtained the desired accounting records. He could have asked for all the funds on hand and have waited while the mentioned records were being made up, but to do so would have necessitated him waiting a considerable time while the records desired by the insurer were being prepared. As Mr. Burroughs stated, "It was almost an impossibility (to obtain a complete accounting on Mondays) unless I wanted to spend a great deal of time in the store to bring everything up to the last money order sold." He further testified the Pettits never refused to turn over money he asked them for.

Because of the practicalities of the ordinary and well understood circumstances involved in making the Monday collections Mr. Burroughs chose to limit those Monday collections to funds received prior to the Monday collection day. Under such circumstances we rule that within the meaning of the mentioned insurance document language "failed to promptly turn over to our collector after he has called upon you to collect the said funds" there was no failure on the part of the Pettits to promptly turn over funds collected by them on Monday, January 23, 1961, for Mr. Burroughs did not call on them to collect

those funds when he visited them that day but chose to leave such funds with the Pettits for a later collection. It is unfortunate that the burglary occurred on the particular Monday evening after an unusually large amount of money orders (which according to the transcript totalled $898.01 rather than $1,445.34) had been sold earlier that day but the loss resulting from this circumstance was one within the coverage of the insurance provided.

For the reasons stated above the judgment is reversed and the cause is remanded to the circuit court with directions to enter judgment for respondents in the amount of $898.01, the correct amount as determined by this court, of the proceeds of the money orders sold on January 23, 1961, and stolen in the burglary.

It is so ordered.

All concur.